IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| RIGIAN KEO, <br> DHS File No. A025274012, <br><br> Petitioner, <br><br> ENRIQUE LUCERO, ET AL., <br><br> Respondents. | ) <br> ) <br> ) <br> ) <br> ) 1:11cv614 <br> ) <br> ) <br> ) <br> ) |

## **MEMORANDUM OPINION**

This case concerns whether 8 U.S.C. § 1226(c) requires that certain deportable aliens be detained during removal proceedings where the Attorney General fails to detain them immediately upon release from prison. Petitioner Rigian Keo ("Petitioner") has filed a Petition for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241 [Dkt. 1], claiming that, because eight years passed between his release from state custody for an aggravated felony conviction and his detention by U.S. Immigrations and Customs Enforcement ("ICE"), he is not subject to mandatory detention under § 1226(c). For reasons explained below, the Court agrees and will grant the Petition.

### **I. Background**

Petitioner is a Cambodian citizen who came to the United States at age two with his family. He acquired lawful

permanent residency one year later, with a retroactive date of September 21, 1981.

On April 18, 2003, Petitioner was convicted of distribution of marijuana, resulting in a sentence of 12-months imprisonment, with nine months suspended. He was released in 2003.

About eight years later, on January 24, 2011, Petitioner was detained by ICE for removal proceedings arising from his 2003 conviction (an event surely triggered by his December 14, 2010 arrest for malicious wounding, which was ultimately *nol prossed*).

On March 31, 2011, an immigration judge ("IJ") denied Petitioner's request for a change in custody status and a release on bond, ruling that Petitioner is subject to mandatory detention under 8 U.S.C. § 1226(c)(1)(B).

On June 6, 2011, Petitioner challenged that finding by filing a Habeas Corpus Petition with this Court under 18 U.S.C. § 2241 [Dkt. 1 ("Pet.")]. The Federal Respondents filed a brief in opposition on July 1, 2011 [Dkt. 5 ("Opp.")]. And Petitioner filed a reply brief on July 5, 2011 [Dkt. 6 ("Reply")]. The Petition for Habeas Corpus is before the Court.

## II. Analysis

Petitioner argues first that his mandatory detention is improper under 8 U.S.C. § 1226(c), second that it violates

his substantive due process rights, and third that it violates his procedural due process rights. As this Court agrees with Petitioner's first argument, it will not reach the latter two.

Section 1226(c)(1) provides:

> The Attorney General shall take into custody any alien who--
>
> (A) is inadmissible by reason of having committed any offense covered in section 1182(a)(2) of this title,
>
> (B) is deportable by reason of having committed any offense covered in section 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of this title,
>
> (C) is deportable under section 1227(a)(2)(A)(i) of this title on the basis of an offense for which the alien has been sentence [FN1] to a term of imprisonment of at least 1 year, or
>
> (D) is inadmissible under section 1182(a)(3)(B) of this title or deportable under section 1227(a)(4)(B) of this title,
>
> *when the alien is released*, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.

(emphasis added). Petitioner claims that the language, "when the alien is released," unambiguously limits § 1226(c)'s mandatory detention requirement to situations where ICE detains the alien at moment of his release from state custody. Respondents argue that the language is ambiguous, that the

3

Bureau of Immigration Appeals ("BIA") reasonably interprets it as mandating detention at *any time after* release from custody, and that this Court must therefore permit that interpretation under *Chevron U.S.A. v. National Resources Defense Council, Inc.*, 467 U.S. 837 (1984).

Step one under *Chevron* requires that this Court ask whether "Congress has directly spoken to the precise question at issue." *Id.* at 842. "[I]t is appropriate to apply cannons of statutory construction at step one of the *Chevron* inquiry." *Nat'l. Fed. Of the Blind. v. FTC*, 420 F.3d 331, 337 (4th Cir. 2005) (citation and internal quotation marks omitted). If the statute is clear, Congress's directive must be followed by the agency administering the statute. But where "a statute is silent or ambiguous with respect to the specific issue," step two considers "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. This Court therefore starts, and, in this case, ends, its analysis with step one (whether 1226(c)(1) is ambiguous).

In interpreting a statute, courts begin with the text of the provision at issue. *N.Y. State Conference v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995). The "preeminent canon of statutory interpretation requires [courts] to 'presume that the legislature says in a statute what it means and means in a statute what it says there.'" *BedRoc Ltd., LLC v. United*

4

*States*, 541 U.S. 176, 183 (2004) (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992)).  The Court is mindful that "[i]n a statutory construction case, the beginning point must be the language of the statute, and when a statute speaks with clarity to an issue[,] judicial inquiry into the statute's meaning, in all but the most extraordinary circumstance, is finished."  *Ramey v. Dir., Office of Workers' Comp. Program*, 326 F.3d 474, 476 (4th Cir. 2003) (citing *Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 475 (1992)).  A court's inquiry "begins with the statutory text, and ends there as well if the text is unambiguous."  *BedRoc Ltd.*, 541 U.S. at 183 (citing *Lamie v. United States Trustee*, 540 U.S. 526, 534 (2004)).

Here, the parties disagree as to the meaning of the word "when" within § 1226(c)'s clause "when the alien is released."  Petitioner argues that it means that detention is only mandated where ICE detains an alien *immediately* upon his release from incarceration for the underlying offense.  Respondents claims that "when" can mean multiple things, including a conditional definition such as "in the event that." The Fourth Circuit has not yet spoken on this issue, but every district court within the Fourth Circuit to have considered it so far, including this Court, has agreed with Petitioner, as

5

have a majority of courts outside this circuit.[1] *See, e.g.*, *Hosh v. Lucero*, No. 1:11cv464, 2011 WL 1871222, at *3 (E.D. Va. May 16, 2011) (Trenga, J.); *Bracamontes v. Desanti*, No. 2:09cv480, 2010 WL 2942757 (E.D. Va. July 26, 2010) (Jackson, J.); *Waffi v. Loiselle*, 527 F. Supp. 2d 480, 488 (E.D. Va. 2007) (Brinkema, J.); *Aguilar v. Lewis*, 50 F. Supp. 2d 539, 544 (E.D. Va. 1999) (Cacheris, J.). Some courts have come out the other way, however, as has the BIA in *In re Rojas*, 23 I. & N. Dec. 117, 2001 WL 537957 (B.I.A. 2001).[2] But having reviewed the competing case law, this Court finds itself with the majority.

In particular, this Court is persuaded by Judge Brinkema's analysis of the definition of "when" as used here. Judge Brinkema stated that "[t]he term 'when' includes the characteristic of 'immediacy,' referring in its primary conjunctive sense, to action or activity occurring 'at the time that' or 'as soon as' other action has ceased or begun." *Waffi*, 527 F. Supp. 2d at 488 (citing 20 The Oxford English Dictionary 209 (2d ed. 1989), and The American Heritage Dictionary of the English Language (4th ed. 2000)). Respondents note that

---

[1] *See, e.g.*, *Quezada-Bucio v. Ridge*, 317 F. Supp. 2d 1221, 1229-31 (W.D. Wash. 2004); *Scarlett v. U.S. Dept. of Homeland Sec. Bureau of Immigration and Customs Enforcement*, 632 F. Supp. 2d 214, 218-20 (W.D.N.Y. 2009); *Oscar v. Gillen*, 595 F. Supp. 2d 166, 169-70 (D. Mass. 2009); *Khodr v. Adduci*, 697 F. Supp. 2d 774 (E.D. Mich. 2010); *Louisaire v. Muller*, 758 F. Supp. 2d 229, 235-38 (S.D.N.Y. 2010); *Burns v. Cicchi*, 702 F. Supp. 2d 281, 288-94 (D.N.J. 2010).

[2] *Saucedo-Tellez v. Perryman*, 55 F. Supp. 2d 882, 884-85 (N.D. Ill. 1999); *Sulayo v. Shanahan*, No. 09-civ-7347, 2009 WL 3003188, at *3-5 (S.D.N.Y. Sept. 15, 2009).

dictionary support exists for their "in the event that" definition as well. (Opp. at 8 (citing Webster's Ninth New Collegiate Dictionary 1342 (1991)).) Although English words often have multiple meanings in the abstract, a plain reading of "when" in context here makes clear that Judge Brinkema's definition is correct.

As Judge Brinkema points out, if Congress intended "when" to refer to an indefinite time period following release, it picked an odd way of expressing it. Respondents' construction would more clearly follow had Congress used a term like "whenever," or "after," or, indeed, "in the event that." *Waffi*, 527 F. Supp. 2d at 488. Even the BIA in *Rojas* stated that "[t]he statute does direct the Attorney General to take custody of aliens *immediately* upon their release from criminal confinement." 23 I. & N. Dec. at 122 (emphasis added). The BIA extended § 1226(c) beyond this command because "Congress was not simply concerned with detaining and removing aliens coming directly out of criminal custody; it was concerned with detaining and removing *all* criminal aliens," *id.*, something the BIA should not have done given its ability to derive the statute's clear meaning one sentence earlier.

Also, as this Court noted in *Aguilar*, "[i]t would be contrary to the plain language to interpret 'when the alien is released' to include aliens who had *already* been released . . .

7

prior to being taken into custody for removal proceedings." 50 F. Supp. 2d at 544 (emphasis added).  Finally, to read the phrase "when the alien is released" as applying to anytime--even 50 years--after the alien is released is essentially to read the phrase out of the statute.  *Waffi*, 527 F. Supp. 2d at 488; *see also, e.g.*, *Babbit v. Sweet Home Chapter*, 515 U.S. 687, 698 (1995)(discussing "[a] reluctance to treat statutory terms as surplusage").  Thus, it is clear to this Court that the plain meaning of "when," as used here, includes the characteristic of immediacy as explained by Judge Brinkema.

Further, Respondents' suggested reading undermines § 1226(c)'s purpose.  As Respondents explain, § 1226(c) arose out of Congressional concern that aliens who were released from immigration custody on bond were absconding before they could be deported.  (Opp. at 3.)  To prevent that from happening, Congress mandated that the Attorney General (through ICE) detain a limited class of deportable aliens during removal proceedings.  Surely, for its mandate to work, Congress must have preferred that such detentions happen sooner than later.  It must have wanted ICE to detain these aliens *before* they could abscond and potentially commit more crimes, not whenever ICE happened to get around to it.

Respondents raise several arguments to the contrary. First, they argue that Congress likely placed the "when . . .

released" language in the statute to make clear that ICE did not have to detain prisoners while they serve federal or state sentences.  (Opp. at 9.)  That may well have been *a* purpose of Congress, but there is no evidence that it was *the* purpose, and it does not weigh in favor of one reading of the word "when" versus another.

Second, Respondents counterproductively argue that Petitioner's definition would render § 1226(c)(1)(D) as surplusage because that provision mandates that certain terrorists be detained regardless of whether they have been convicted of any crime.  Tellingly, though, Respondents cite no support for the notion that § 1226(c)(1)(D) actually does this, perhaps because to read that section as mandating detention regardless of criminal conviction is to ignore the language at issue in this case: "when the alien is released."  Under *any* definition of that language, including "in the event that," the alien has to be "released" from something.  There must therefore be a conviction *before* mandatory detention kicks in for the statute to make any sense at all.  Otherwise, the "when the alien is released" language is rendered superfluous.

Petitioner presents a far more plausible analysis on this point.  (*See* Reply at 6.)  A terrorist who is not convicted of a crime can easily be detained under § 1226(a) at the Attorney General's discretion.  But only a convicted terrorist

9

falls under § 1226(c), and even then only with a conviction is his detention *mandatory*.

Respondents' next argument is that Petitioner's reading would lead to absurd results, specifically, that otherwise dangerous aliens could avoid mandatory detention "if ICE authorities are not waiting on the jailhouse steps at the exact moment that those aliens are released from criminal custody." (Opp. at 11.) But Congress wanted ICE to do exactly that. As Respondents repeatedly emphasize, Congress's point in enacting § 1226(c) was to assure that a certain class of deportable aliens would not abscond before they could be deported. Perhaps the most obvious step towards such a goal is to detain such aliens *immediately* upon their release from state or federal custody, before they have a chance to vanish. Respondents' argument misses this key point. Section 1226(c) is a *command* to ICE to detain certain people *immediately*. *Hosh*, 2011 WL 1871222, at *3 (stating that Respondents' position "vitiates the clear Congressional command to the Attorney General to act in a timely manner in order to prevent a designated alien from returning to the community before his deportation").

As for the "absurd" result that these aliens might avoid *mandatory* detention by touching free soil before ICE reaches them, it is only absurd if considered outside the fact

that the Attorney General is welcome to detain such aliens through his *discretionary* authority under § 1226(a).  A seemingly more absurd result would be that *despite* Congress's admonition that ICE take these aliens into custody *before* they can disappear, ICE could wait as long as it wants--here eight years, in another case perhaps 50--before following Congress's directive, with no difference in outcome.

These factors further support this Court's plain reading of the statute as inapplicable to an alien, such as Petitioner, who was taken into custody long after being released from state incarceration.  This Court concludes that § 1226(c) does not apply to Petitioner as it is written, and, therefore, that Petitioner should be provided with an individualized bond hearing pursuant to 8 U.S.C. § 1226(a).  This Court will therefore grant the Petition in part and will remand this matter to the appropriate Immigration Court for the purpose of providing Petitioner with such a bond hearing within fifteen days of the date of this Opinion and Order.  The Court will retain jurisdiction over Petitioner's fee request pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, pending further briefing and argument.  *Hosh*, 2011 WL at 1871222, at *4.

### III. Conclusion

For these reasons, the Court will grant in part the Petition and will retain jurisdiction over Petitioner's fee request.

July 13, 2011  _____/s/_____
Alexandria, Virginia  James C. Cacheris
UNITED STATES DISTRICT COURT JUDGE